132-17/PJG

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

ARAB BANK (SWITZERLAND) LTD.,

       Plaintiff,                                                 17 Civ. 469 (WWE)

            - against -                          **DECLARATION IN SUPPORT OF**
                                                     **APPLICATION FOR COUNTER-**
                                                              **SECURITY**

SEA MASTER SHIPPING, INC.,
     *In Personam*

       and

M/V "SEA MASTER", her engines, rigging,
equipment and appurtenances, etc.
     *In Rem*

                      Defendants.

------------------------------------------------------------x

       Costas Marinakis, pursuant to Section 1746 of Title 28 of the United States Code, hereby declares and says the following:

       1.     I am the Chartering Manager at Marinakis Chartering, Inc., with offices at 39 Broadway in New York.

       2.     Marinakis Chartering acts as chartering brokers and operational agents (in conjunction with Mega Shipping – who serves as vessel manager) for the M/V SEA MASTER and the Owner of that vessel, SEA MASTER SHIPPING Inc. ("Sea Master" or "Owner").

       3.     I submit this Declaration in support of Sea Master's application for counter-

464810.1

security in this arrest proceeding, and I have personal knowledge of the matters and things described below based upon my personal involvement in this transaction and my review of the documents and communications regarding this difficult and protracted voyage, with which I am fully familiar.

4.      I will begin with a review of the contractual relationships involved in this transaction, followed by a review of the circumstances surrounding the prolonged nature of this voyage (10 months), and will conclude with an outline of the basis for and the calculation of Owner's counterclaim and the state of the proceedings in London (where the Bank's claim and Owner's counterclaim will be decided).

**The Charter:**

5.      Pursuant to a charter party dated April 25, 2016 (hereinafter the "Charter"), the M/V SEA MASTER was chartered to Agribusiness United DMCC (hereinafter the "Charterer") for a single voyage, for the carriage of soybean meal, soya hull pellets and corn from Argentina to a several ports in the Mediterranean, including Casablanca, Agadir and others (in the Charterer's option).

6.      A copy of the Charter party is annexed to this declaration as Exhibit 1, and provides (at Clause 62 of the Rider) for an application of English law and London arbitration of "any dispute arising out of or in connection with this Contract".

**The Loading:**

7.      Pursuant to the terms of the Charter, the vessel duly proceeded to Argentina in accordance with the agreed "laycan" (*see* Clause 16 of the Charter calling for the vessel to arrive between April 24/29, 2016), and thereafter tendered its NOR (*i.e.* Notice of Readiness) at

the customary arrival place of Recalada, to go upriver to load at Punta Alvear and Rosario.

8. It then sat (for 53 days) awaiting cargo, until late June 2016 when loading finally commenced on June 21st.

9. Thereafter, and over the course of the next six days the vessel loaded a quantity of 26,700 metric tons of corn (shipped by Cargill), and 7,000 metric tons of soya hull pellets and 7.000 metric tons of soybean meal (shipped by Glencore).

10. Bills of Lading were issued for this cargo which provided for carriage to Agadir and Casablanca, both in Morocco. (*See* Ex. 2, copies of the bills of lading issued in respect to the above mentioned cargo loaded at ports in Argentina.)

11. As noted, loading was completed on June 27, 2016 at which point the vessel departed for the ocean transit to Morocco.

**The Discharge Takes Seven (7) Months:**

12. After completing the transatlantic passage, the vessel arrived and tendered its NOR at Agadir, Morocco on July 14, 2016, where a portion of the Cargill corn cargo was discharged -- that discharge being completed on July 20, 2016.

13. Thereafter, the vessel was directed to Casablanca for additional discharge of product still remaining onboard the ship.

14. The vessel arrived at Casablanca on July 21, 2016, spent several days waiting at the anchorage for an available berth and eventually berthed on July 27, 2016.

15. The vessel then discharged the balance of the Cargill corn cargo that was still onboard, as well as the full cargo of 7,000 M/T of soya hull pellets.

16. The discharge of the corn and the soya hull pellets was completed on August 25,

2016, at which point the vessel shifted to the anchorage with the remaining product of 7,000 metric tons of soybean meal still onboard.

17. During the period the vessel at Casablanca waiting and discharging, the allowable "laytime" had expired (*i.e.* the agreed period within which the vessel was to have completed full discharge of all cargo), at which point the vessel went on "demurrage". The precise date the vessel went on demurrage was August 2, 2016 (at 0537 hours), after which all time accruing would be chargeable at the rate of $8,750 per day.

18. A copy of the discharge laytime calculation reflecting the time used (up through August 2, 2016 when the vessel went on demurrage) is annexed hereto as Exhibit 3, and includes the period at Casablanca while the vessel was discharging the corn and the soya hull pellets, as well as the long-duration the vessel remained "on demurrage", pending discharge of the balance, all as discussed more fully below.

19. At no time on or before the discharge of the corn cargo did the Owner receive any communication from the Plaintiff, Arab Bank (Switzerland) Ltd. (hereinafter the 'Bank") admonishing it not to discharge the corn.

20. In this respect, I was the individual that had the most contact with respect to this transaction and the arrangements for the discharge, and I was involved in the daily transmissions and receipt of all communications regarding the transaction, the movements of the vessel, the operations and the discharge of the cargo.

21. I note that in paragraph 6 of the Complaint, the Bank asserts that it had nominated a "protective agent" in respect to the corn cargo and had asked that agent to contact the Owner with instructions not to deliver the corn. The Bank goes on to state that the Owner

breached an obligation by thereafter doing so.

22. This is not accurate.

23. As noted above, at no point did the Bank or protective agent acting on its behalf communicate any instructions not to deliver the corn, and while I appreciate that it is not for the Court to determine the merits of the claim, I did not want to leave the Court with the impression that the allegations in the complaint were accurate, or that there had been any mis-delivery on the Owner's part with respect to the corn or any cargo for that matter, carried on this voyage.

24. I should also mention for the Court's guidance that during the period of discharge in Morocco, there were many communications regarding the completion of this transaction and we, as Owner's agents, subsequently became aware of the fact that the Bank was involved, and indeed was calling the shots, so to speak, as to where and when the cargo would be delivered.

25. As the Bank acknowledges in its pleadings, it held the bills of lading for the cargo loaded on the vessel, and was actively involved, as it acknowledges in its complaint, in the decisions regarding where and to whom the product would be delivered.

26. But as I noted above, there was no communication or instruction ever received from the Bank or any agent acting on its behalf not to deliver the corn, or any of the other products on board the vessel.

27. Returning to the timeline of events, after the completion of discharge at Morocco, the vessel sat idle at Casablanca for weeks, waiting for instructions with respect to the discharge of the remaining 7000 metric tons of soybean meal that remained onboard.

28. During the period of waiting, there were discussions about possibly proceeding

to Algeria for discharge, but it was not until September 13, 2016, that firm orders to proceed to the port of Oran were issued, at which point the vessel sailed from Casablanca for Oran.

29. At this point (i.e. September 13, 2016), the vessel had been "on demurrage" with respect to discharge for the better part of a month and a half (with no demurrage paid, and freight outstanding), with the Owner being effectively forced to warehouse the product for the Bank, which was still holding the bills of lading (demurrage continuing to accrue at the rate of $8,750/ day).

30. As of the departure for Oran, those demurrage charges totaled approximately $375,000.

31. The vessel transited to Oran -- arriving on September 15, 2016. Upon arrival, however, there was no nomination of an agent to make arrangements for the discharge of the cargo, nor a receiver for that matter. Instead, the vessel sat idle at Oran until October 4, 2016, at which point the authorities in control of the port ordered the vessel out of the port on the basis that there was no commercial purpose for it to sit there - there being no receiver for the cargo.

32. Throughout this period of time, we, on behalf of the Owner, were repeatedly asking for clear discharge instructions, and there were numerous communications relating to the prolonged waiting time, the ever escalating costs and damages, and the potential that the transaction would have to come to an end.

33. As the days dragged out, there was a discussion regarding the incorporation of an additional discharge port in Lebanon to enable the cargo to be sold there, as well as alternative discussions regarding a transshipment of the product to another vessel that would take place in Oran.

34. Eventually, the vessel was directed to proceed to Tripoli, Lebanon and departed for that location on November 15, 2016.

35. The vessel arrived to Tripoli on November 22, 2016, but there were no firm arrangements in place for a discharge of the cargo there either, and so the vessel sat idle at the anchorage.

36. The vessel remained idle throughout the balance of November, all through December and then into January, with no cargo discharged.

37. Indeed, it was not until February 15, 2017 that the vessel was shifted into a berth, commenced discharge, and eventually completed on Monday February 20, 2017. (*See* Ex. 3, demurrage statement reflecting completion of discharge on February 20, 2017.)

**Counterclaim Calculation**

38. Insofar as the Owner's counterclaim is concerned, the total balance due in connection with the carriage and the prolonged delays in arranging discharge (in effect, floating storage) amounts to $1,496,985.24. (*See* Ex.4, Freight and Demurrage invoice prepared by Marinakis Chartering.)

39. In addition to the foregoing, there were numerous items of expense incurred by the Owner during the period of this prolonged delay during which the vessel was housing the cargo which remained under the control and direction of the Bank. These additional charges and expenses amount to $527,997.44, as reflected on the expense spreadsheet annexed hereto as Ex. 5.

40. As noted above, I appreciate that it is not for the Court to determine the merits of the claims between the parties, and so I have not included as exhibits the dozens and dozens of

communications that were exchanged during the course of this ten (10) month saga, but I should mention that as it became clear that the Bank was exercising control over the cargo and influencing the decisions as to what to do with it, and there were many exchanges with the Bank (directly and/or through representatives/attorneys) which confirmed what the Bank otherwise admits in the complaint - that it held the bills and participated in and/or made the decisions about where the vessel would transit and to whom the product would be sold/delivered, with the Bank receiving the proceeds.

41.  As mentioned above, however, at no point did the Bank ever communicate to us a prohibition against discharging any of the cargo at or before the point where discharges took place.

**The London Proceedings:**

42.  Insofar as the proceedings in London are concerned, there is an ongoing arbitration between the Owner and the Charterer, and similar arbitration that has been commenced between the Bank and the Owner.

43.  In respect to the latter proceedings, the Bank has commenced arbitration against the Owner for what the Owner considers to be a spurious claim for mis-delivery of the corn. (*See* Ex. 6, copy of the Bank's demand for arbitration and appointment of its arbitrator, and the discussion above outlining Owner's position regarding the purported mis-delivery).

44.  The Owner has responded, appointing its arbitrator in respect to its defense of the Bank's claim and for purposes of prosecuting its counterclaim for recovery of the losses identified above (*i.e.* $1,496,985.24 identified in the freight/demurrage invoice, plus the additional costs of $527,997.44) under contract, quasi-contract and tort theories of recovery.

45. As became evident during the course of this protracted transaction, the Bank has exercised control over the cargo, directed the movements of the vessel and has received the benefit of both the transportation and storage services (provided by the Owner), all of which eventually enabled the Bank to sell the product, in particular, the soya bean meal cargo which the Bank left on the vessel for a period of some eight (8) months, and then sold to buyers in Tripoli.

46. That sale of the soya bean meal in Tripoli reaped a significant windfall for the Bank by virtue of the high market price obtained (as compared to the purchase price), which came about as a consequence of the fact that Tripoli had not, for considerable period of time, received sufficient quantities of soybean meal, and hence the product commanded a significant premium, all garnered at the expense of the Owner who was forced to warehouse the product while the Bank sought and obtained a lucrative sales price.

47. The total of the Owner's application for counter security to secure its counterclaim is in the sum of $2,024,982.68, plus interest and anticipated legal fees/costs in London in the same ratios/amounts as utilized in the Bank's application (*i.e.* 7% compounded quarterly for a period of two years of $267,464, and legal fees estimated at $500,000) for a total countersecurity figure of $ 2,792,446.68.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: New York, New York
March 27, 2016

Constantinos Marinakis