132-17/PJG
UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
------------------------------------------------------------x
ARAB BANK (SWITZERLAND) LTD.,
    Plaintiff,

- against -

SEA MASTER SHIPPING INC.,                         17 Civ. 469 (WWE)
    *In Personam*

    and
M/V "SEA MASTER", her engines, rigging,
 equipment and appurtenances, etc.
    *In Rem*
                                      Defendants.
------------------------------------------------------------x

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION FOR COUNTERSECURITY

FREEHILL, HOGAN & MAHAR LLP
*Attorneys for Defendants*
Peter J. Gutowski, Esq.
Thomas M. Canevari, Esq.
80 Pine Street, 25th Floor
New York, NY 10005-1759
(212) 425-1900 (T)
(212-425-1901 (F)

*Local office:*
246 Margherita Lawn
Stratford, CT 06615
(203) 921-1913

1

465069.1

## PRELIMINARY STATEMENT

Defendant Sea Master Shipping, Inc. ("Sea Master" or "Owner") respectfully submits this Reply Memorandum in further support of its emergency application for countersecurity from Plaintiff, Arab Bank (Switzerland) Ltd. (the "Bank").

## ARGUMENT

I. **The Owner's Counterclaim Arises from the same Transaction and Occurrence as the Bank's Claim.**

As articulated in Sea Master's moving brief, Supplemental Rule E's requirement that a counterclaim arise from the same "transaction or occurrence that is the subject of the original action" involves a standard identical to the one under Rule 13 in respect to compulsory counterclaims. Courts considering whether Rule E's requirement has been satisfied thus employ the same broad, flexible definition of the word "transaction." *See Phx. Bulk Carriers, Ltd. v. Am. Metals Trading, LLP*, 742 F. Supp. 2d 486, 490 (S.D.N.Y. 2010) ("[T]he compulsory counterclaim test in this Circuit is repeatedly described as broad and flexible") (citing *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 209 (2d Cir. 2004)).

Under that approach, a transaction "may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Eastwind Mar., S.A. v. Tonnevold Reefer 7 KS*, 2008 U.S. Dist. LEXIS 92566, at *11 (S.D.N.Y. Nov. 10, 2008).

In maritime cases, such as this one, district courts in the Second Circuit "generally consider the 'same transaction or occurrence' requirement to be met where the counterclaim arises from **the same contract or voyage** as the original claim." *Eastwind Mar., S.A. v.*

*Tonnevold Reefer 7 KS*, 2008 U.S. Dist. LEXIS 92566, at *10 (S.D.N.Y. Nov. 10, 2008) (emphasis added).

Indeed, and under many of the very cases cited by Plaintiff in its opposition memorandum that involve counterclaims that essentially mirror the one being advanced here, have been determined to meet the test (i.e. claim and counterclaim arose from one contract or voyage qualifying as same "transaction or occurrence" for purposes of satisfying the requirement). *See Rice Co. v. Express Sea Transp. Corp.*, 2007 U.S. Dist. LEXIS 84300, at *10 (S.D.N.Y. Nov. 15, 2007) (claim and counterclaim involved the same voyage to Iran); *Tang Kheok HWA Rosemary v. Jaldhi Overseas Pte Ltd.*, 531 F. Supp. 2d 586 (S.D.N.Y. 2008) (claim and counterclaim involved the same oral agreement); *Ocean Line Holdings Ltd. v. China Nat'l Chartering Corp.*, 578 F. Supp. 2d 621 (S.D.N.Y. Sept. 26, 2008) (claim and counterclaim involved the same vessel grounding and sinking); *Front Carriers Ltd. v. Transfield ER Cape Ltd.*, No. 07-cv-6333, 2007 U.S. Dist. LEXIS 85177, at *1 (S.D.N.Y. Nov. 19, 2007) (claim and counterclaim each asserted breach of the same contract of affreightment); *Dongbu Express Co. v. Navios Corp.*, 944 F. Supp. 235, 236 (S.D.N.Y. 1996) (claim and counterclaim each asserted a breach of the same charter agreement).

Desperate to find a way to distance the "claim" from the "counterclaim" (so as to avoid the obligation to post countersecurity), the Bank advances an argument that there are really dozens of tiny contracts in play here -- each represented by the individual bills of lading that were issued. As such, the Bank suggests its claims under the corn bills (which totaled about 10) should be considered as wholly separate and distinct from the claims for demurrage and delay that the bank claims arose under other bills for other cargo. Such a fine distinction finds no support in the law or the facts.

At the outset, the Bank is simply wrong that no demurrage accrued or is due in connection with the corn discharge. (*See* Marinakas Reply at ¶¶ 11-13 noting demurrage is in fact due for the period in July/August when the corn was discharged). As such, a portion of the demurrage relates directly to the time frame that corn cargo (under which the Bank is making its claim) arose. But more to the point, every bill of lading issued on this (i) single voyage, (ii) by this single ship, (iii) for the carriage of bulk cargo, (iv) from South America, (v) to Morocco, incorporated *a single charter party* which provides for London arbitration of any claims and dispute "arising out of or in connection with this Contract". The bills, therefore, are wedded at the hip to the Charter Party, and hence all claims that involve this voyage are subject to the same arbitration provision and are inexorably connected for purposes of applying the broad and flexible approach taken by the courts in examining whether a counterclaims is related to the main claim.

The logical extension of the banks argument in this situation underscores the ludicrous nature of its position. If the bank is correct, and there are many individual contracts represented by each and every Bill of lading, then the Bank would presumably have to start 10 or so individual arbitrations to prosecute those separate claims. It has obviously not done so, however, instead choosing to bundle all of its claims under the individual bills of lading into one London arbitration connected via the incorporated Charter Party. The same obviously holds true in connection with the claims that come back against the Bank under the other bills of lading all connected to the same Charter Party for demurrage, detention and other damages.[1]

---

[1] The Bank's effort to diminish the significance of the Charter Party and otherwise distance itself from that contract by noting that it was not named as a party is unavailing. The arbitration provision in the Charter Party is not limited to just the owner and charterer, and captures all manner of claims that arise under that contract. By virtue of the incorporation of that contract into every bill of lading, the Charter Party and the bills are united, and the Bank's effort to artificially carve out the corn cargo to enable it to get security just for its claims should be rejected outright.

4

This was a single voyage transaction involving one ship, one charterer, one Owner and one Bank. The Bank's effort to avoid its countersecurity obligations with a truncated argument about dozens of mini individual contracts fails under the law and under the facts.[2]

## II. The Owner has Good and Viable Counterclaims under English law.

Turning to the Bank's suggestion that the Owner has no claim under English law and hence should not be entitled to countersecurity, this puts the cart before the horse, not that the position is even correct.

Focusing first on the basis for the claim, the Bank was intimately involved in the transaction, and interjected itself into the daily working of the vessel, the discharge, and the diversion of the vessel to Tripoli for purposes of selling the remaining 7,000 M/T of cargo. (*See* Marinakis original and reply Declarations, noting the many instances of direct intervention in the transaction.) Indeed, the Bank was so involved that it actually got into the business of creating the bills of lading for the cargo, arranged to detain the ship to ensure it kept the second buyer on the hook for the eventual sale of the soy bean meal in Tripoli, and was busy issuing and recalling the bills on the sale there. (*See* Marinakis Reply Dec'l at ¶¶ 16-17 noting bank's issuance of the soya bean meal bill of lading, and ¶¶ 19-31 noting Bank's involvement in the restraint of the vessel and the transmission, recalling, and re-transmission of the bills to ensure the sale to the new buyer).

---

[2] That Plaintiff's claim and Sea Master's counterclaim arise from the same voyage from Argentina to the Mediterranean is alone sufficient to justify an award of countersecurity here under the cases cited above. *See Eastwind Mar., S.A. v. Tonnevold Reefer 7 KS,* 2008 U.S. Dist. LEXIS 92566, at *10. Likewise, the cases the Bank sites to support denial, including *Eastwind,* 2008 U.S. Dist. LEXIS 92566, and *May Ship Repair,* No. 08-CV-280, 2009 U.S. Dist. LEXIS 75804 (E.D.N.Y. Jan. 21, 2009), are totally inapposite or are easily distinguishable. *Eastwind* involved the claims arising "from different charter parties between different entities for different voyages which took place a year apart and involved shipments of different types of goods." 2008 U.S. Dist. LEXIS 92566, at *12-13. *May Ship* largely dealt with the question whether a breach of contract claim raised by the defendant in that case formed part of the same transaction or occurrence as a prior casualty of which the repair contract was a byproduct. The court held that it was not because "a mere sine qua non relationship is insufficient to establish that claims arise out of the same transaction or occurrence." 2009 U.S. Dist. LEXIS 75804, at *7. The Bank cites to no authority where claims arising on the same voyage under bills all connected to one charter do not qualify.

In addition, the Bank's own documents belie it supposed "hands-off" approach, and instead confirm that it was actively involved in monitoring and controlling the vessel's operations. (*See, e.g.*, Ex. C to the Pillon Declaration identifying and revealing the email exchanges between the Bank and its recently disclosed agent, with the Bank, via that agent, who was [we now see] monitoring, supervising and interjecting itself into the vessel's operations.) As such, and from a factual perspective, there is ample factual predicate of conduct to support the counterclaims against the Bank.

Shifting the focus to the legal side of the equation, and as is outlined in the accompanying declaration from Nick Parton, the Bank does indeed have direct exposure under English law for the delays, demurrage and detention damages suffered in the circumstances of this case as a holder, and there are "good and viable" grounds for the assertion of the counterclaims that have already been submitted in that proceeding in London. (*See* Parton Reply Declaration at ¶¶ 5, noting that "under English law, under the facts of this case" Owner has "good and viable grounds" to prosecute its counterclaim against the Bank for demurrage, detention, and the costs incurred on this voyage); *see also* Marinakis' Dec'l., Dkt # 21, at Ex. 7 with Owner's appointment of its arbitrator and submission of the counterclaims into the existing London arbitration proceedings.)

The Owner has viable and factually supportable counterclaims against the Bank which support the application for countersecurity.

### III.     The Owner Has Met the Pleading Standard, Which is All that Really Matters.

Finally, the whole effort by the Bank to avoid posting countersecurity by directing the inquiry to what would essentially amount to a determination of the claim is utterly misplaced, given that the scope of the Court's inquiry at this form of an application is "severely limited."

*Front Carriers Ltd. v. Transfield ER Cape Ltd.*, 2007 U.S. Dist. LEXIS 85177, at *6 (S.D.N.Y. Nov. 16, 2007). And, as explained by then-District (now Second Circuit) Judge Lynch, provided that a counterclaim is well pled, it is sufficient for purposes of a countersecurity application. *Voyager Shipholding Corp. v. Hanjin Shipping Co. Ltd.*, 2008 U.S. Dist. LEXIS 11045 (S.D.N.Y. Feb. 13, 2008). There is a well pled counterclaim already on file here (*see* Owner's Answer and Counterclaim at Dkt. # 18), that same claim has already been introduced into the London proceedings (*see* Ex. 7 to Dkt # 21), and that ends the inquiry. But to be sure, Owner has submitted far more in support of the viability of the counterclaim, including the Declaration of Mr. Nick Parton, who establishes the clear line of authority which renders an entity like the Bank liable for the failure to have arranged discharge within a reasonable period of time. (See accompanying Parton Reply Legal Declaration.)

For these reasons, Sea Master's application for countersecurity should be granted in the sum of $2,792,446.68, and the Bank should be directed to immediately post countersecurity security in the form required by the Supplemental Rules.

## CONCLUSION

For the reasons outlined herein, Plaintiff should be required to immediately provide Sea Master with countersecurity in the amount of $2,792,446.68.

Dated: New York, New York
      March 30, 2017

465069.1

FREEHILL HOGAN & MAHAR LLP
*Attorneys for the Defendants*

By: _____
Peter J. Gutowski
*gutowski@freehill.com*
80 Pine Street, 25th Floor
New York, NY 10005-1759
(212) 425-1900 (T)
(212-425-1901 (F)

*Local office:*
246 Margherita Lawn
Stratford, CT. 06615
(203) 921-1913

TO: MAVRONICOLAS P.C.
Attorneys for Plaintiff
850- Canal St. 3rd. Floor
Stamford, CT. 06902
Tel: 203 314-4737
Fax: 866-744-9005
Attn:  Anthony J. Mavronicolas, Esq.
       Peter Dee, Esq.

VIA ECF